# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

ROEDA S.,

Plaintiff,

-v.-                                                    1:20-CV-906
                                                        (GLS/ATB)
COMMISSIONER OF SOCIAL SECURITY,

Defendant.

LEWIS B. INSLER, ESQ., Attorney for Plaintiff
CHRISTOPHER LEWIS POTTER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT and RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Gary L. Sharpe, Senior United States District Court Judge pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with

General Order 18.[1]

# I.    PROCEDURAL HISTORY

On December 22, 2017,[2] plaintiff filed an application for Disability Insurance

Benefits ("DIB"), alleging disability beginning February 7, 2017,[3] due to "Right Elbow

Injury, Q-bital [sic]Tunnel with Neva [sic] damage, Reading, Writing, [and]

---

[1] The court notes that, contrary to the instructions contained in General Order 18, plaintiff's counsel filed a motion for judgment on the pleadings with his brief. (Dkt. Nos. 11, 12) (General Order No. 18(c) provides that plaintiff file only a brief in support of his or her position, and the court will treat the filing as if it had been accompanied by a motion for judgment on the pleadings. (*Id.*) Thus, the court will refer to plaintiff's motion in the recommendation herein.

[2] Plaintiff's counsel cites December 26, 2017 (Pl.'s Br. at 2, citing T. 160) as the date of plaintiff's application.  However, the actual date of her application was December 22, 2017, as stated by the ALJ and as noted in the record. (T. 10, 67).

[3] Plaintiff originally asked for an onset date of December 12, 2016, but amended that request to February 7, 2017 during her administrative hearing. (Administrative Transcript ("T.") at 10, 40).

Comprehension." (T. 67, 204). The application was denied initially on March 22, 2018. (T. 82). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held by video on April 1, 2019, and at which plaintiff and a vocational expert ("VE") testified. (T. 36-65). On April 23, 2019, ALJ Kieran McCormack found plaintiff was not disabled. (T. 10-29). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on July 8, 2020. (T. 1-5).

The court notes that plaintiff states that she filed a new application for DIB the day after the Appeals Council denial of her request for review. (Pl.'s Br. at 2). Plaintiff's new application was granted on October 10, 2020, with a disability onset date of April 24, 2019, the day after ALJ McCormack's unfavorable decision.[4] (Pl.'s Br. at 2 and Dkt. Nos. 12-1, 12-2).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such  severity

---

[4] The new application is not part of the administrative record in this case.  Plaintiff's counsel has filed the related documents as exhibits to his brief.

> that [she] is not only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience, engage in any other
> kind of substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in which
> [she] lives, or whether a specific job vacancy exists for [her], or whether
> [she] would be hired if [she] applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20

C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI

disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If [she] is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits [her] physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations. If the claimant has such an impairment, the
> [Commissioner] will consider [her] disabled without considering
> vocational factors such as age, education, and work experience …
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, [she] has the
> residual functional capacity to perform [her] past work. Finally, if the
> claimant is unable to perform [her] past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

4

## III. **FACTS**

Plaintiff was born on June 6, 1968 and was 48 years old on her alleged onset date. (T. 66). Plaintiff testified that she worked for Ulster County BOCES as a bus driver and a custodian from 2004, until she left the job in 2017. (T. 42-42). She drove a bus in the morning and in the afternoon and did custodial work between "runs." (T. 43-44). Her custodial work was whatever the "head custodian" told her to do, including sweeping floors, cleaning toilets, changing light bulbs, and shoveling snow. (T. 44). She was injured while shoveling snow at work on December 12, 2016. (T. 18, 44, 48).

Plaintiff testified that she had cubital tunnel syndrome[5] release surgery on her right elbow in June of 2017. (T. 48). She stated that she could not stretch her right arm out fully and had lost feeling in her right hand after the surgery. (T. 49). Plaintiff testified that she could not type or write with her right hand, but she could "do everything with" her telephone. (T. 50-51). Her left side began to cause her pain because she overused it while compensating for the loss of function on her right side. (T. 49-50). Plaintiff testified that she used a wrist brace on both wrists to support her arms, but the brace she wore on her left side was more for "comfort." (*Id.*) Plaintiff stated that she originally had "trigger finger," but this impairment was resolved with surgery. (T. 50). Plaintiff also testified that surgery resolved the carpal tunnel[6]

---

[5] Cubital tunnel syndrome occurs when the ulnar nerve, which passes through the cubital tunnel on the inside of the elbow becomes inflamed, swollen, and irritated. www.cedars-sinai.org/health-library/diseases-and-conditions/c/cubital-tunnel-syndrome.html.

[6] The carpal tunnel is a narrow passageway surrounded by bones and ligaments on the palm side of the hand. Carpal tunnel syndrome is caused by pressure on the median nerve which passes through this area. www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/symptoms-causes/syc-20355603.

impairment in her right hand. (*Id.*)  Plaintiff testified that she used a "machine" that "sends pulses" to her elbow, then later stated that she used a TENS Unit.[7] (T. 52, 53).

Although plaintiff testified that she had "problems" with her right knee, she stated that she had "always had trouble with [her] right knee." (T. 51).  She stated that she fell when she was younger. (*Id.*)  At the time of the hearing, she stated that it bothered her, that occasionally it "locks," but that there was nothing they could do for it, and she just "favor[ed] it." (*Id.*)  She did not take any medication for it. (*Id.*)  Plaintiff stated that she tried taking pain medication, but her "allergies" and her "resistance to medication" prevented her from continuing any medication, so she just "deals with the pain" by using ice, heat, and the TENS machine for her arm. (*Id.*)

Plaintiff described her daily routine. (T. 53-55).  She got up in the morning and tried to shower. (T. 53).  She ate breakfast, prepared by her mother, and used the TENS machine. (T. 53-54).  By then, she stated that she was ready to lie down again. (T. 54).  She rested and got up again, and that is what she did all day long. (*Id.*)  If the weather was nice, plaintiff sat outside for a while, and then it was time for lunch.  After lunch, plaintiff used her TENS machine and did "a whole list of stuff that the therapist told [her] to do." (T. 54).

Plaintiff then lay down until her mother got home at 3:00 p.m., and they played a "tile game" that her mother enjoyed. (*Id.*)  Her mother made dinner, and plaintiff tried to help with the dishes in order to "have the movement." (*Id.*)  After dinner, plaintiff

---

[7] "Transcutaneous electrical nerve stimulation (TENS) therapy involves the use of low-voltage electric currents to treat pain. A small device delivers the current at or near nerves. TENS therapy blocks or changes [the] perception of pain." https://my.clevelandclinic.org/health/treatments/15840-transcutaneous-electrical-nerve-stimulation-tens

got ready to go to bed.  Getting in and out of her clothes was difficult, so getting ready

for bed took a while. (*Id.*)  Plaintiff testified that she helped with some chores, like the

dishes because she "can stand." (T. 55).  Plaintiff's mother did the laundry, but plaintiff

tried to fold her own clothes. (*Id.*)

Plaintiff testified that she had a car and could drive to the market and go

shopping, although, she generally had someone come with her. (T. 55)  Plaintiff stated

that she could not drive for extended periods, and it took her longer, because she had to

stop when her left arm got tired. (T. 51, 56).  She stated that she could definitely "not"

drive a bus. (T. 51).

Plaintiff testified that she was "not good at" lifting, she could not lift anything

with her right hand, but she could put the handles of a bag over her right forearm and

carry the bag with both hands. (T. 58).  Plaintiff stated that she dropped everything.

(*Id.*)  Plaintiff testified that she could lift a quart of milk with her left hand. (T. 59).  Her

mother transferred milk from a half gallon container to a quart container so that plaintiff

could lift it. (*Id.*)  Plaintiff testified that she moved in with her mother for financial

reasons, but also because plaintiff was unable to "do stuff." (T. 59-60).  She could reach

overhead with her left hand, but not with her right. (T. 60).  She testified that she would

not reach across the table with her right side. (*Id.*)  Plaintiff testified that she could only

stand for about 15-20 minutes before her right knee began to bother her.[8] (*Id.*)

The ALJ then took testimony from VE Robert Baker. (T. 61).  The ALJ asked VE

Baker to assume that an individual could perform light work. (T. 61).  However, the

---

[8] Plaintiff testified that she could stand for a longer period, but that she would have pain later.
(T. 60).

hypothetical person could only reach overhead, handle, and finger with her dominant hand on an "occasional basis." (*Id.*)  There were no transferable skills because the individual's previous work was unskilled. (T. 62)  The VE testified that such an individual could not perform plaintiff's previous work, but could perform the jobs of investigator, dealer accounts; usher; and page. (*Id.*)  However, if the individual were limited to sedentary work, there would be no jobs available. (T. 62-63)  In response to a question by plaintiff's counsel, the VE testified that, if the individual in the ALJ's first hypothetical could not lift more than one or two pounds with her dominant hand and could not lift more than ten pounds with her non-dominant hand, she could not perform any jobs. (T. 63-64).

Plaintiff's brief contains a summary of the medical evidence in this case. (Pl.'s Br. at 5-13).  Rather than including a summary of the medical evidence at the outset, I will discuss the relevant medical reports and opinions as they are relevant to my analysis below.

## IV.    THE ALJ'S DECISION

At step one of the sequential evaluation, the ALJ found that plaintiff was not engaging in substantial gainful activity and had not done so since February 7, 2017, the amended date of onset. (T. 12-13).  At step two of the evaluation, the ALJ found that plaintiff suffered from the following severe impairments: right carpal tunnel syndrome; right cubital tunnel syndrome; status-post release surgery in June of 2017; and right knee degenerative joint disease ("DJD"). (T. 13).  The ALJ found that plaintiff's elbow impairment, together with any mental disorder involving reading, writing,

comprehension, understanding and/or attention were not severe. (T. 14-16). In doing so, the ALJ specifically considered plaintiff's medically determinable mental impairment in relation to the four broad areas of functioning. (T. 15-16).

At step three, the ALJ found that plaintiff's impairments did not, singly or in combination, rise to the severity of a Listed Impairment, nor did they "medically equal" the severity of a listing. (T. 16). In doing so, the ALJ considered Listings 1.02 (Major Joint Dysfunctions); 11.14 (Peripheral Neuropathy); and 12.04 (Depressive, Bipolar, and related disorders).[9]

At step four, the ALJ found that plaintiff could perform light work, except that plaintiff could "occasionally" reach overhead with her dominant right arm, and "occasionally" handle and finger with her dominant right hand. (T. 17-26). In this section, the ALJ weighed the relevant medical evidence and discussed its persuasiveness.[10] (*Id.*) Based on this analysis and the VE's testimony, the ALJ then found that plaintiff could not perform her past relevant work as a school bus driver/ janitor, but that plaintiff could perform other jobs, existing in significant numbers in the national economy. (T. 26-28). As a result, the ALJ found that plaintiff was not disabled from February 7, 2017 through the date of his decision on April 23, 2019. (T. 28).

## V.  **ISSUES IN CONTENTION**

Plaintiff raises the following arguments in support of her position that the ALJ's

---

[9] In considering these mental impairments, the ALJ considered the combination of impairments that he found to be non-severe at step two.

[10] The relevant details of such consideration will be discussed below in relation to the plaintiff's arguments.

decision is not supported by substantial evidence:

1. This case should be remanded under Sentence Six of 42 U.S.C. § 405(g) to consider the subsequent approval of benefits. (Pl's Br. at 13-15) (Dkt. No. 12).

2. The ALJ's RFC determination contains errors of law. (Pl.'s Br. at 17-21).

3. The ALJ failed to resolve an "inconsistency" with the Dictionary of Occupational Titles based on his hypothetical question and the testimony of the VE. (Pl.'s Br. at 21-23).

Defendant argues that the Commissioner's decision is supported by substantial evidence. (Def.'s Br. at 4-21) (Dkt. No. 14). For the following reasons, this court agrees with the defendant and will recommend affirming the Commissioner's final decision.

## VI.    **SUBSEQUENT GRANT OF BENEFITS**

### A.    **Legal Standards**

Sentence six of 42 U.S.C. § 405(g) provides as follows:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]

42 U.S.C. § 405(g). The Second Circuit has held that to be "material," the evidence must be relevant to the claimant's condition for the period in which benefits were denied, and "probative." *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004). In considering whether a subsequent award of benefits fit into this category, the Second Circuit held that a subsequent award of benefits "is not itself evidence of disability but, rather, a conclusion based on evidence." *Caron v. Colvin*, 600 F. App'x 43, 44 (2d

Cir. 2015).  A subsequent favorable decision may be supported by evidence that is new and material under section 405(g), "but the decision is not itself new and material evidence." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir. 2009) (cited in *Caron, supra. See also Baker v. Comm'r of Soc. Sec.*, 520 F. App'x 228, 229 n.* (4th Cir. 2013) (unpublished order); *Cunningham v. Comm'r of Soc. Sec.*, 507 Fed. App'x 111, 120 (3d Cir. 2012) (unpublished order).

In *Caron*, the court further noted that the fact that two ALJs may permissibly come to different conclusions based on the same record, is not "probative" of anything. *Caron*, 600 F. App'x at 44 (citing inter alia *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 127 (2d Cir. 2012)).  The court in *Caron* also held that the subsequent favorable decision was not relevant to the claimant's condition during the time period in question. *Id.  See also Barnaby v. Berryhill*, 773 F. App'x 642, 644 (2d Cir. 2019) (". . . the later determination, on its own, is neither evidence of Barnaby's disability nor support for the claim that the ALJ's decision in this case was unsupported by substantial evidence.") (citing *Cage, supra*).

### B.    Analysis

Plaintiff has two documents to her brief in this case: (1) a "Notice of Award," which was issued after plaintiff's subsequent application for disability benefits, and (2) a document that appears to be part of plaintiff's subsequent application. (Dkt. Nos. 12-1, 12-2).  The subsequent application was granted on October 10, 2020 with an onset date of April 24, 2019, the day after the ALJ's decision in this case. (Dkt. No. 12-2). Plaintiff attempts to distinguish the case law above by citing to a case from the

Southern District of New York from 2008 which held that a subsequent favorable determination by the Commissioner, finding a claimant to be disabled one day after the ALJ's unfavorable decision was "new and material evidence under 42 U.S.C. § 405(g)", and that the failure to consider the impact of the favorable decision could cause "manifest injustice." *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 503 (S.D.N.Y. 2008).

In 2013, this court considered, and rejected, a similar claim in *Polynice v. Colvin*, No. 12-CV-1381 (DNH/ATB), 2013 WL 6086650, at *20-21 (N.D.N.Y. Nov. 19, 2013), *aff'd*, 576 F. App'x 28, (2d Cir. Aug. 20, 2014). Plaintiff argued that a subsequent favorable decision should be considered in analyzing the ALJ's determination. At the time this court decided *Polynice*, I noted that there was "some doubt in this circuit and in the federal courts more broadly, as to whether and under what circumstances a disability determination resulting from a re-application for benefits should be considered new evidence warranting a remand to the Commissioner to reconsider a prior finding that a claimant is not disabled." *Id.* at *20 (comparing, inter alia, *Perry v. Astrue*, 5:11-CV-74 (GLS), 2012 WL 280738, at *2 n. 7 (N.D.N.Y. Jan. 31, 2012) (although plaintiff's subsequent application for benefits was granted, this decision is of no moment to the court's review of the ALJ's decision in this case); *Mikol v. Barnhart*, 554 F. Supp. at 503-504 (if the ALJ reviewing a subsequent claim references material relating to the period covered in the first claim, the later decision is considered new and material evidence, warranting a remand with respect to the first claim). Given the limited nature of a "substantial evidence" review, I found that a subsequent disability determination did not compel a finding that an earlier,

inconsistent determination of an ALJ was unreasonable. *Polynice*, 2013 WL 6086650, at *21 ("the ultimate finding of the later adjudicator would seem to have little, if any, marginal probative value in reviewing the original determination, particularly in a case such as this, where there is only a subsequent administrative finding of disability, and not an ALJ's decision which spells out the basis for the later determination").

The Second Circuit's decisions in *Polynice*, *Caron*, and *Barnaby* have largely resolved any doubt in the Second Circuit about the import of a subsequent finding of disability during a later time period. Those cases make clear that two administrative adjudicators, looking at the similar evidence, may arrive at different conclusions with respect to disability, and both conclusions could be supported by substantial evidence.

Plaintiff argues that this case is distinguishable from *Polynice* because the subsequent favorable administrative decision in *Polynice* contained an onset date two years after the challenged ALJ's determination. However, although plaintiff's new application in this case cited a disability onset date of April 24, 2019, the day after the ALJ's decision in this case, the second application was submitted on or about July 24, 2020. (Dkt. No. 12-2 at 1). While it is unclear exactly what new evidence the agency considered, plaintiff's second application listed medical visits and tests relating to the time period between the first ALJ's decision in April 2019 and the date of plaintiff's new application in July of 2020. (Dkt. No. 12-2 at 6-8). Thus, for all of the above reasons, the fact that plaintiff received a subsequent favorable decision with an onset date of April 24, 2019 does not constitute new and material evidence requiring a remand under sentence six of section 405(g) of the ALJ's finding that plaintiff was not

disabled during the time period prior to April 24, 2019.

Plaintiff also argues that, even if her new favorable decision does not require a remand under sentence six, the ALJ's determination was not supported by substantial evidence and contained various legal errors and should be remanded for further consideration under sentence four of section 405(g). The court will proceed to consider whether the ALJ's decision was supported by substantial evidence.

## VII.  RFC/Weight of the Evidence

### A.  Legal Standards

#### 1.  RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R.

§§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)

(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v.*

*Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019);

*Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions

plaintiff is capable of performing, and may not simply make conclusory statements

regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267

(N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*,

728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v.*

*Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*,

307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a

narrative discussion, describing how the evidence supports the ALJ's conclusions,

citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No.

3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing

SSR 96-8p, 1996 WL 374184, at *7).

## 2.    Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record

and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL

374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues

are not "medical issues," but are "administrative findings." The responsibility for

determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL

374183, at *2. These issues include whether the plaintiff's impairments meet or equal a

listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether

the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that she accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

The regulations regarding the evaluation of medical evidence were amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

**B.    Analysis**

Plaintiff misleadingly argues that the RFC is "incomplete and improper" because the ALJ failed to properly consider plaintiff's left elbow impairment, "knee issues," and

"multiple [cervical] disc herniations." (Pl.'s Br. at 18-21).[11]  Although plaintiff does not challenge the severity determination per se, she argues that the ALJ did not properly consider these impairments in determining plaintiff's RFC.  Before the court considers plaintiff's arguments, the proper standards must be outlined.

In cases such as this one, in which the ALJ finds some, but not all of the plaintiff's impairments to be severe, an error in the severity analysis at step two may be harmless[12] because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone.  *Tryon v. Astrue*, No. 5:10-CV-537 (MAD), 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244 (GLS/ATB), 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)).  This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923; *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995).

The ALJ determined that plaintiff's right carpal tunnel syndrome; right cubital

---

[11] As defense counsel points out, the plaintiff inaccurately refers to the ALJ's "blithe dismissal of both the left elbow and knee issues as 'non-severe'" (Pl.'s Br. at 19).  The ALJ specifically found plaintiff's knee impairment severe and considered it as such in determining the RFC. (T. 13).  Plaintiff's counsel corrected this error later on when he stated that the "ALJ found the degenerative joint disease to be severe at Step Two . . . ." (Pl.'s Br. at 20).

[12] Contrary to plaintiff's argument, harmless error does apply to Social Security cases, whether the error is factual or legal error. *See Johnson v. Comm'r of Soc. Sec.*, 790 F. App'x 325, 326-27 (2d Cir. 2020) (summary order) (citations omitted); *Johnson v. Comm'r of Soc. Sec.*, No. 19-CV-5615(KAM), 2021 WL 848841, at *5 (E.D.N.Y. Mar. 4, 2021); *Cottrell v. Colvin*, 206 F. Supp. 3d 804, 810 (W.D.N.Y. 2016) (noting that an error is considered harmless where proper consideration of the physician's opinion would not change the outcome of the claim) (citing *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)); *Camarata v. Colvin*, No. 14-CV-0578, 2015 WL 4598811, at *16 (N.D.N.Y July 25, 2015) (denying the request for remand because application of the correct legal standard would not change the outcome).

tunnel syndrome, status post release surgery in 2017; and the right knee degenerative joint disease were severe, while finding that plaintiff's cervical radiculopathy, her left elbow impairment, and any alleged learning disorder[13] were not severe. However, the ALJ specifically recognized that "[t]he effects of these non-severe impairments, singly and in combination, has [sic] nevertheless been considered for the residual functional capacity." (T. 13). The ALJ then proceeded past step two to consider the remainder of the sequential process.

Plaintiff also argues that the court should "accept" plaintiff's claims of disabling pain under the "long standing rule" in this circuit that if there is a medically determinable condition that could reasonably be expected to cause plaintiff's pain, "the complaints must be accepted." (Pl.'s Br. at 19) (citing *Snell v Apfel*, 177 F3d 128, 135 (2d Cir. 1999); *Rivera v Schweiker*, 717 F2d 719, 729 (2d Cir 1983)). Plaintiff has only cited part of the process for considering a plaintiff's symptoms. The evaluation of symptoms involves two steps. First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529 (a), (b); 416.929(a), (b). If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical

---

[13] Plaintiff has never claimed a "mental impairment." In her application, she alleged some problems with reading and writing comprehension. The ALJ found any learning disorder was not severe. (T. 14-16). The ALJ conducted the entire psychiatric technique review in making his determination. (*Id.*) Plaintiff does not appear to be challenging this finding or its incorporation into the ultimate RFC determination.

evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original)).[14]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p).  The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76.  However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743 at *11 (S.D.N.Y. 2/19/2019) (citing *Rousey v. Comm'r*

---

[14] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings. The 2016 ruling has removed the emphasis on "credibility."

*of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)).  "[R]emand is not required

where 'the evidence of record allows the court to glean the rationale of an ALJ's

decision.'" *Cichocki v. Astrue*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722

F.2d 1033, 1040 (2d Cir. 1983)).

　　The existence of a medically determinable impairment which could reasonably

produce the symptoms alleged by the plaintiff does ***not*** require the ALJ or the court to

accept the plaintiff's complaints, without further consideration.  The ALJ cited the

proper standard in his decision. (T. 17). The court must analyze the ALJ's RFC

determination pursuant to the appropriate and current standards, and plaintiff is

incorrect when she argues that the existence of a medically determinable impairment

alone requires the court to accept her allegations of disabling pain.

### 1.　Left Elbow and Cervical Impairments

　　At step two, the ALJ found that left elbow x-rays taken on May 24, 2018 showed

edema, consistent with lateral epicondylitis.[15] (T. 13) (citing T. 502).  The ALJ also

cited a subsequent nerve conduction study which showed chronic C5, C6, and C7

radiculopathies, with no evidence of median or ulnar nerve neuropathies. (T. 13) (citing

T. 508).  The ALJ noted that although the plaintiff complained of left elbow pain during

subsequent visits to her various physicians and some physical examinations showed left

elbow tenderness, none of the examinations "showed significant limitations in the range

of motion of the left elbow or significant neurological abnormalities." (T. 13-14) (citing

---

[15] Lateral epicondylitis, also known as tennis elbow, is a "painful condition that occurs when tendons in your elbow are overloaded, usually by repetitive motions of the wrist and arm." https://www.mayoclinic.org/diseases-conditions/tennis-elbow/symptoms-causes/syc-20351987.

T. 556-60, 569-75, 633-40).

Even if the ALJ erred in determining that plaintiff's left elbow and cervical impairments were not severe at step two, the ALJ's discussion at step four shows that he continued to consider the effects of these impairments, and the functional limitations caused by each, in combination with plaintiff's severe impairments to establish the plaintiff's RFC. (T. 19-20).  The ALJ began by discussing the severe impairment on plaintiff's right side because her left elbow pain did not begin until early 2018.

The ALJ also noted plaintiff's June 2017 cubital tunnel release surgery, which was performed by Dr. Shasha Ristic.  The ALJ stated that plaintiff was improving postoperatively. (T. 18-19).  Plaintiff's numbness and tingling were improving. (*Id.*) Although plaintiff still had limited range of motion due to pain and guarding, she maintained active and passive mobility in her fingers and good elbow stability. (*Id.*) However, when she returned to her previous job in September of 2017, the duties involved in that job increased her symptoms. (T. 19).

On December 20, 2017, Dr. Ristic stated that plaintiff "had been doing great,"[16] but she had been "overdoing it at work," resulting in worsening elbow pain. (T. 310). On physical examination, plaintiff was "tender both medially and laterally," but her

---

[16] Dr. Ristic's November 15, 2017 report stated that plaintiff continued to "have some residual numbness and pain.  However, much improved." (T. 312).  The report stated that motion was improved, strength was improved, there was much less pain, even though plaintiff continued to have "some" discomfort when working. (T. 313).  The court understands that plaintiff's return to work has been considered an unsuccessful work attempt.  I cite this report only for the purpose of showing that the plaintiff had improved, and the ALJ's analysis was correct.  Dr. Ristic issued a similar opinion in August of 2017, when he stated that plaintiff was improving with therapy, was doing well, notwithstanding some residual numbness and pain. (T. 314-15).  In addition, it is clear that plaintiff could not perform her previous job.  Thus, her inability to perform her former heavy work is not determinative of her disability status.

elbows were stable, there was no sign of infection, and no atrophy. (T. 311). Dr. Ristic took plaintiff out of work because "her work duties" were irritating the arm. (*Id.*)

The ALJ then noted that by January of 2018, plaintiff was complaining of severe left elbow pain, together with throbbing, burning, and numbness in the left hand. (T. 19). The ALJ noted that Dr. Ristic diagnosed her with left elbow pain, left wrist pain, and left elbow epicondylitis. (T. 19). Dr. Ristic believed that plaintiff's left sided problems were a "compensatory" effect from the right sided injury. (*Id.*) He requested diagnostic studies. (T. 19, 420). Contemporaneous occupational therapy notes showed that plaintiff was still able to zip with her left hand, and the ALJ cited the occupational therapy notes, dated January 31, 2018, which stated that loss of sensation and strength in the right hand were the "***primary limitations to function***." (T. 19, 423) (emphasis added). The ALJ discussed Dr. Ristic's subsequent examinations, citing both positive and negative results. (T. 19-20).

The ALJ also considered extensive additional medical evidence. In August of 2018, plaintiff was examined by Dr. Richard Dentico, M.D., at Orthopedic Associates, who found full active range of motion in plaintiff's cervical spine, 5/5 muscle strength in shoulder abduction, elbow flexion, elbow extension, wrist extension, finger abduction, and finger flexion, even though passive range of motion in the left elbow caused significant pain in the medial portion of the elbow.[17] (T. 581). Her gait was

---

[17] Plaintiff went to Dr. Dentico primarily for examination of her cervical spine, but the doctor conducted a physical examination and "MMT" (manual muscle testing) of her shoulders, elbows, wrists, and fingers. (T. 580, 581).

normal, with no limping or "ataxia."[18] (T. 581).  Spurling test was negative bilaterally.[19]

The ALJ then considered Dr. Dentico's October 2018 examination which noted decreased strength in plaintiff's right long finger flexion, but full left hand strength. (T. 20) (citing T. 586-88).  Cervical range of motion was full and pain-free. (T. 587).  Dr. Dentico stated that, notwithstanding the positive EMG findings, plaintiff had no neck pain, and in his conclusion, he stated that he had "very little clinical suspicion that [plaintiff had] a cervical radiculopathy causing her arm pain." (T. 586-88).  Most of the pain was emanating from the elbows to the hands. (T. 587).  Sensory testing was intact on the left, and there was a dull sensation appreciated at C7 and C8 on the right, "but otherwise intact pinpricks." (T. 587).  Plaintiff's gait was normal, and Dr. Dentico recommended no further "workup or treatment" of plaintiff's cervical spine.[20] (T. 587-88).  Dr. Dentico recommended neurological consultation for the numbness in plaintiff's left upper limb and the weakness in her right hand. (T. 588).  In an "amendment" to the report, the doctor stated that plaintiff was "temporarily totally disabled," should remain out of work, and that she was "unable to perform any significant physical activity.[21] (T. 588).

---

[18] Ataxia is defined as a loss of muscle control or coordination. https://www.mayoclinic.org/diseases-conditions/ataxia/symptoms-causes/syc-20355652.

[19] A Spurling test is done to reproduce any neck pain by compressing the affected nerve root. https://www.webmd.com/back-pain/what-is-spurling-test.

[20] Plaintiff told Dr. Dentico that the physical therapy she was doing for her cervical spine was making the other symptoms worse. (T. 586).

[21] Most of plaintiff's medical records were generated as the result of her Workers' Compensation case, and the doctors often referred to degrees of impairment.  Plaintiff recognizes that the Workers' Compensation determination is not necessarily indicative of disability for purposes of Social Security. (Pl.'s Br. at 12-13, 19) (citing inter alia T. 555).

The ALJ then cited progress notes from Hurley Avenue Family Medicine which contradict Dr. Dentico's amendment asserting that plaintiff could not perform "any significant physical activity." (T. 21).  In September 2018, Dr. Maura Sullivan, M.D. stated that plaintiff was wearing braces on both arms and had a "loss of grip strength b/l."[22] (T. 606).  However, in November of 2018, plaintiff denied "back pain, joint pain, trouble walking, and weakness." (T. 607).  She walked with a normal gait, her upper extremities were normal to inspection and palpation, her muscle tone was normal bilaterally, and she had full range of motion bilaterally. (T. 608).

The ALJ cited a contemporaneous late November 2018 examination by Physician's Assistant Bridget Beebe of Orthopedic Associates, which resulted in similar findings. (T. 21) (citing T. 614-16).  While plaintiff still complained of weakness and numbness, PA Beebe's examination noted no significant tenderness to palpation of the right elbow, and although she had decreased sensation in the right hand, she was able to flex and extend her fingers. (T. 615).  She had diffuse tenderness in the medial aspect of the left elbow and some limitation in range of motion secondary to pain and stiffness. (*Id.*)  She was able to flex and extend the fingers of the left hand. (*Id.*)

The ALJ also discussed the progress notes written by neurologist Surinder P. Jindal, M.D., who examined plaintiff between October of 2018 and February of 2019. (T. 21).  The ALJ found these reports to be similar to each other and unremarkable, except for decreased arm strength to 4/5, and elbow tenderness with decreased

---

[22] Plaintiff walked with a "normal gait." (T. 606).

sensation. (T. 21).  On October 31, 2018, Dr. Jindal found limited range of motion of the "elbow region" in all directions, but did not include specific limitations. (T. 575). He noted that plaintiff's gait was normal. (T. 575).  He recommended conservative pain treatment and orthopedic follow up.[23] (T. 21) (citing T. 574-75).  Dr. Jindal's last two examinations in December 2018 and January 2019 contained similar findings. (T. 623, 627).

The ALJ noted that a January 2019 examination by Dr. Dentico resulted in similar findings, with manual muscle testing showing 5/5 strength in "bilateral upper limbs" in January. (T. 634).  Pinprick testing on the left side at the lateral elbow hyperesthesia, and normal pinprick sensation at the C5, C6, and C8 dermatomes. (T. 634).  On the right side the plaintiff felt no pinprick in dermatomes at C7 and C8, but had intact pinprick testing at C6, C5, and T1. (*Id.*)  Her gait was normal with no ataxia. (*Id.*)

Dr. Dentico's February 20, 2019 progress note found 4/5 strength in the upper limbs. (T. 639).  The doctor stated that there were "pain limitations" throughout, but the ALJ noted that no specific limitations were stated. (T. 21).  In Dr. Dentico's February report, he noted "grossly intact" light touch sensory testing in bilateral upper limbs, but no hyperflexia in bilateral biceps, triceps, or pronator teres. (T. 639).  For the first time, Dr. Dentico noted that plaintiff had an antalgic gait. (*Id.*)  On August 29, 2018, Dr. Dentico noted that, notwithstanding the cervical radiculopathy, plaintiff's "[a]ctive

---

[23] An elecromyographic study in early November 2018 showed moderate right carpal tunnel, worse than the March 2017 study, and chronic right C7 radiculopathy, but no right ulnar neuropathy. (T. 576).

ROM of the cervical spine was full and pain-free in all planes . . . ." (T. 581).

Plaintiff had a repeat MRI on February 1, 2019 which confirmed the cervical radiculopathy. (T. 636-37). In his February 2019 report, Dr. Dentico mentioned the recent MRI which showed cervical disc herniation at C3, C4, C5, and C6, but did not assess any functional limitations as a result. (T. 636-37, 639).

The ALJ then considered the reports of the physicians who gave "medical opinions," expressing the plaintiff's ability to perform the various work-related functions. (T. 21-25). The ALJ considered Dr. Adam Soyer, M.D., a Board-Certified Orthopedic specialist, who conducted several examinations of the plaintiff for Workers' Compensation. (T. 22-23). The ALJ considered the consultative examination by internist, Dr. John Caruso, conducted on March 1, 2018. (T. 23-25). The ALJ also considered the report submitted by Dr. Vinluan, the state agency specialist, who conducted a non-examining initial evaluation on March 22, 2018. (T. 25, 75-76).[24] The ALJ discussed the persuasiveness of each physician's opinions, finding that the most persuasive of the opinions was Dr. Soyer's October 2018 report. That report stated that plaintiff could lift up to 20 pounds, and was consistent the "rest of the evidence,"[25] including Dr. Vinluan's March 2018 opinion finding that plaintiff could perform light work, with reaching and handling restrictions. (T. 25).

---

[24] The court notes that Dr. Caruso is an anesthesiologist. (T. 402). Dr. Vinluan's medical specialty code (19) indicates that he or she is an internist. (T. 76); Program Operations Manual ("POMS") DI 24501.004 - Medical Specialty Codes  https://secure.ssa. gov/poms.nsf/lnx/0424501004.

[25] The ALJ summarized each of Dr. Soyer's reports and discussed why he found that the most recent report was the most persuasive. Dr. Soyer's previous reports each assessed a different lifting restriction from 15 pounds in April of 2017, 10 pounds in February of 2018, 15 pounds in June of 2018, to 20 pounds in October of 2018. (T. 22-23).

Although he utilized some of Dr. Caruso's March 1, 2018 report in his analysis, the ALJ found that Dr. Caruso's more restrictive opinion regarding plaintiff's general ability to do work, was inconsistent with the other evidence of record, including plaintiff's statements of her daily activities. (T. 25). Dr. Caruso noted full flexion, extension, and rotary movement bilaterally in the cervical spine.[26] (T. 399). Dr. Caruso noted an inability to oppose plaintiff's middle, ring, and pinky fingers on the right side, with a reduced grip strength of 2/5. (T. 401). She was given a "Teddy Bear" device and was unable to use the velcro, zip, button, and buckle with the right hand or tie the laces with both hands. (T. 401). Plaintiff's strength and dexterity were full on the left. (T. 399, 401).

Although Dr. Caruso opined the plaintiff displayed "marked" limitations for fine motor coordination of the right hand and fingers, she had full range of motion in her elbows, forearms, and wrists bilaterally, although her movements were slower on the right. (T. 399, 401). Dr. Caruso noted that plaintiff seemed to be "in denial" about her medical condition, often stopping to see how much "further" she could go. He stated that these attempts to push herself may have resulted in some spasms in the fingers on her right hand. (T. 399). Dr. Caruso found 3/5 strength in the upper right extremity, but full strength in the upper left, and both lower extremities. (T. 400). There was no muscle atrophy, "even in the area of the right upper extremity." (*Id.*) Dr. Caruso noted that plaintiff's knee was swollen at the end of the examination. (*Id.*) Dr. Caruso

---

[26] Notwithstanding Dr. Caruso's restrictive findings, he found full bilateral movement in plaintiff's cervical spine (T. 399), further supporting the ALJ's finding that plaintiff's cervical impairment was not severe, as it did not impede her movement.

concluded that plaintiff had a moderate to marked limitation walking, moderate limitations squatting and climbing stairs, mild limitations rising from a chair and twisting, and no significant limitation bending. (T. 402).

Dr. Caruso stated that, in her right upper extremity, plaintiff demonstrated "extremely moderate and even marked limitations" because of her insistence on "forcing" herself to perform activities involving reaching overhead, lifting and carrying heavy objects. (T. 402). Plaintiff had moderate limitations pushing and pulling with the right upper extremity, and marked limitations with fine motor coordination of the hands and fingers of the right hand, with grasping and holding, and with doing the "activities" on the Teddy Bear device. (*Id.*) Finally, Dr. Caruso stated that plaintiff appeared to be "in denial" about her physical condition, and that she should discuss her physical limitations with her physician. (*Id.*)

The ALJ noted that Dr. Caruso did not include any specific limitations in his medical source statement, other than the "degree of severity." (T. 24). The ALJ discussed why he believed that Dr. Caruso's more restrictive opinion was partially inconsistent with his own findings as well as inconsistent with other medical evidence of record. The ALJ stated that Dr. Vinluan, the state agency physician, considered Dr. Caruso's report, but still found that plaintiff could perform light work with additional restrictions. (T. 25). Dr. Vinluan also considered Dr. Soyer's 2017 reports in determining that plaintiff could perform light work with additional restrictions on reaching overhead and handling. The ALJ commented that although plaintiff submitted additional medical records after the date of Dr. Vinluan's report, "[they do] not support

greater limitations than those already considered in his residual functional capacity assessment." (T. 25).

Plaintiff criticizes the ALJ's statement, and argues that the ALJ simply restated the findings of the state agency reviewer, and did not consider plaintiff's arm, knee or cervical impairments. Plaintiff's argument, however, is unsupported. The ALJ specifically stated that Dr. Vinluan's March 2018 evaluation was consistent with (i) Dr. Soyer's October 2018 report, which found that plaintiff could lift up to 20 pounds;[27] (ii) Dr. Dentico's October 2018 opinion regarding plaintiff's handling and fingering restrictions; and (iii) Dr. Jindal's January and February 2019 reports, indicating that plaintiff had bilateral upper extremity strength of 4/5 and intact sensory testing in the upper limbs. (T. 26). Thus, the ALJ did not "abrogate[] his role as fact finder, leaving it to a person or persons who only reviewed a portion of the evidence." (Pl.'s Br. at 18).

The ALJ went through each of the physical requirements of light work and the additional restrictions, citing the portion of the record which supported his RFC determination. (T. 26). Although the plaintiff argues that the ALJ engaged in "picking and choosing" only the evidence that supported his findings, the ALJ's decision recognized the many limitations suffered by the plaintiff and specifically analyzed the extent of these limitations in his decision, ultimately finding that plaintiff's limitations did not prevent her from performing substantial gainful activity. (T. 26). The ALJ

---

[27] Dr. Soyer specifically stated that "this individual is capable of returning to work with the following restriction: No lifting greater than 20 lbs." (T. 559). No other restrictions were listed. While this statement was made for the purposes of Workers' Compensation and not "determinative" for purposes of Social Security, the comment clearly reflects on plaintiff's functional abilities, and the ALJ included additional restrictions in his RFC for overhead reaching as discussed herein.

clearly considered plaintiff's alleged limitations on the right and the left side. Many of the reports refer to both arms. The ALJ did not fail to consider plaintiff's cervical and left arm symptoms, and his finding that neither of these impairments substantially limited plaintiff's functional abilities was supported by substantial evidence. Thus the ALJ was not required to include additional restrictions in the RFC relative to these impairments.

## 2.    Knee Impairment

Plaintiff argues that the ALJ inappropriately determined that plaintiff could walk six hours per day by citing her "non-antalgic" gait "and "other evidence." (Pl.'s Br. at 20-21). Plaintiff cites to Dr. Caruso, who found plaintiff to have an antalgic gait. (*Id.*) The "other evidence" that plaintiff did not mention in her argument was the ALJ's statement that in addition to an non-antalgic and independent gait, plaintiff had adequate lower extremity strength, and adequate reflexes and sensation in her lower extremities. (T. 26) (citing T. 580-82, 586-88 (inter alia, non-antalgic, independent gait - 8/29/18, 10/22/18); 606 (walks with a normal gait); 575 (gait is normal - 10/31/18).

All of these reports post-date Dr. Caruso's examination, and the court notes that Dr. Caruso is only one of two physicians who stated that plaintiff's gait was antalgic. Orthopedic surgeon, Dr. Dentico found plaintiff's gait antalgic on February 22, 2019, but on January 3, 2019, her gait was normal.[28] (T. 635, 639). On November 14, 2018, December 12, 2018, January 10, 2019, and February 7, 2019, neurologist, Dr. Jindal

---

[28] The court notes that Dr. Caruso's more restrictive opinion came at approximately the same time as Dr. Soyer's finding that the plaintiff could lift only 10 pounds and could not do any fine manipulation with her right hand. (T. 395, 535).

reported that plaintiff had a normal gait with no ataxia.[29] (T. 619, 623, 627, 631).

The ALJ also cited to plaintiff's Function Report, dated January 15, 2018, in which plaintiff indicated all the functions that she believed were limited by her impairments, but stated that sitting, standing, and walking were not affected. (T. 230). The ALJ cited this statement in support of his finding that plaintiff could sit for the two hours required in light work, but would apply equally to assessing her ability to walk. (T. 26).

### 3.    Additional Restrictions Included in the RFC

The ALJ also considered the severe restrictions on the use of plaintiff's right hand for gripping and fingering as stated in Dr. Caruso's report. (T. 26). In determining that plaintiff could only reach overhead, handle, and finger occasionally on the right side, the ALJ used Dr. Caruso's finding that plaintiff had only 2/5 grip strength on the right.[30] (*Id.*) That was the most limited finding of plaintiff's grip strength in the entire medical record.[31] The ALJ only noted restrictions on overhead reaching because those were the only restrictions discussed by the doctors who examined plaintiff, even though plaintiff vaguely testified that if she had to reach across the table, "I don't do that." (T.

---

[29] Ataxia is defined as the "lack of muscle control or coordination of voluntary movements, such as walking or picking up objects." https://www.mayoclinic.org/diseases-conditions/ataxia/ symptoms-causes/syc-20355652.

[30] Dr. Caruso found that plaintiff had "marked" limitations in the right hand and fingers for fine motor coordination, moderate to marked limitation for grasping and holding on the right side, and marked limitations for activities "on the teddy bear," such as tying, buckling, and zipping. (T. 401). However, Dr. Caruso found that plaintiff only had moderate limitations pushing and pulling with the right upper extremity. (T. 402).

[31] Other physicians found 4/5 strength in plaintiff's right hand. (T. 639 - Dr. Dentico; 574 - Dr. Jindal).

60). She stated that she would "go" around the table to get the item. (*Id.*)  On October 31, 2018, Dr. Jindal noted "limited" range of motion of the elbow region in all directions, but did not specify the degree of limitation. (T. 575). The ALJ also considered plaintiff's activities of daily living and her statements regarding these abilities. (T. 17, 26).  The ALJ is entitled to include such a consideration in his opinion. *See Medina v. Comm'r of Soc. Sec*., 831 F. App'x 35, 36 (2d Cir. 2020) (allowing ALJ to consider daily activities in determining consistency with alleged symptoms); *Roland M. v. Saul*, No. 8:19-CV-1624 (MAD), 2020 WL 7356716, at *4-5 (N.D.N.Y. Dec. 15, 2020).

The ALJ does not have to reconcile every shred of evidence. *Marcano v. Comm'r of Soc. Sec.*, No. 20-CV-4230 (JPO/RWL), 2021 WL 5315703, at *2 (S.D.N.Y. Nov. 16, 2021) (citing inter alia *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)). However, "the ALJ may not ignore or mischaracterize evidence of a person's alleged disability." *Id.* (citing *Ericksson v. Commissioner Of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 268-69 (2d Cir. 2008) (overlooking and mischaracterizing evidence); Ruiz v. Barnhart, No. 01-CV-1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence). In this case, the ALJ did not ignore or mischaracterize evidence.  Rather, he weighed conflicting evidence and made his RFC determination.  Even if the court would have ruled differently, I must uphold the Commissioner's finding unless "'a reasonable factfinder would have to conclude otherwise.'" *Id.* (quoting Brault, 683 F.3d at 448). In this case, the ALJ took time to specify each physical function required in light work and

cited to the portion of the record upon which the ALJ relied in coming to that conclusion. This court finds that the ALJ's RFC determination was supported by substantial evidence. While there may have been medical evidence expressing some greater limitations, the ALJ considered and rejected those findings based on other evidence in the record.

## VIII. Vocational Testimony (Step Five)

### A. Legal Standard

If the ALJ utilizes a VE at the hearing, generally, the VE is asked a hypothetical question that incorporates plaintiff's limitations. Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).

A Social Security Administration Policy Interpretation Ruling ("SSR") governs the Commissioner's assessment of whether any particular job can accommodate a given claimant's physical limitations. *Lockwood v. Comm'r of Soc. Sec.*, 914 F.3d 87, 91 (2d Cir. 2019) (citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)). Under SSR 00-4p, the Commissioner "rel[ies] primarily on the [Dictionary of Occupational Titles ("DOT")] . . . for information about the [job's] requirements." SSR 00-4p, 2000 WL 1898704, at *2. However, the Commissioner "may also use [VEs] . . . to resolve

complex vocational issues." *Id.*  If the Commissioner does consider VE testimony, he must be alert to the possibility of "apparent unresolved conflict[s]" between the testimony and the DOT. *Id.* In light of this possibility, SSR 00-4p "tasks the Commissioner with 'an affirmative responsibility to ask about any possible conflict.'" *Lockwood*, 914 F.3d at 91 (citing SSR 00-4p at *4).  The Commissioner must then "'elicit a reasonable explanation for [any such] conflict before relying on the [VE's testimony].'" *Id*. (citing SSR 00-4p at *2).

**B.    Analysis**

Plaintiff argues that the ALJ erred when he failed to "make the additional inquiry" under *Lockwood*, owing to the plaintiff's reaching limitation.  In *Lockwood*, the plaintiff was required to "avoid ***all*** overhead reaching tasks." 914 F.3d at 92.  The jobs listed by the VE in *Lockwood* all required occasional or frequent "reaching." *Id.* "Reaching" is defined as "extending the hands and arms in ***any*** direction." SSR 85-15, 1985 WL 56857, at *7 (Jan. 1, 1985) (emphasis added).  Because the plaintiff in *Lockwood* could not reach overhead at all, the Second Circuit found "a potential inconsistency with [the VE's] testimony that a claimant with a restriction on overhead reaching is capable of performing the three jobs at issue." 914 F.3d at 92.

In this case, however, the ALJ found that plaintiff could occasionally reach overhead, and there were no additional reaching limitations.  Plaintiff concedes that all the jobs listed by the VE during his testimony require only "occasional" reaching. (Pl.'s Br. at 22).  Thus, there is no conflict between the VE's testimony, plaintiff's RFC, and the DOT requirements for the three jobs listed. *See also Monserrate B. v. Comm'r of*

*Soc. Sec.*, No. 1:20-CV-700 (DB), 2021 WL 2587249, at \*5 (W.D.N.Y. June 24, 2021) (distinguishing *Lockwood* because plaintiff was restricted only in overhead reaching). The ALJ specifically asked whether the VE's testimony was "consistent with the DOT," and the VE responded in the affirmative. (T. 63). In his decision, the ALJ specifically stated that he considered SSR 00-4p, and "the undersigned has determined that the [VE's] testimony is consistent with the information contained in the [DOT]." (T. 28). Because this court has found that the ALJ's determination of plaintiff's RFC is supported by substantial evidence, the ALJ was not required to obtain any further information, or engage in any additional analysis, regarding plaintiff's reaching limitations and the definitions of the listed jobs, all of which require only occasional reaching, overhead or in any other direction.

**WHEREFORE**, based on the findings above it is

**RECOMMENDED**, that the plaintiff's motion for judgment on the pleadings (Dkt. No. 11) be **DENIED**, the defendant's cross-motion[32] for judgment on the pleadings (Dkt. No. 14) be **GRANTED**, and plaintiff's complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE</u>**

---

[32] As stated above, plaintiff filed a "motion" for judgment on the pleadings. Defense counsel has proceeded in accordance with General Order No. 18 and filed only a brief. However, the court will treat defendant's submission as a cross-motion for judgment on the pleadings.

**APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 72.


Dated: January 5, 2022

Andrew T. Baxter
U.S. Magistrate Judge